Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 21/03 C 264 | **DATE** | 3/23/2004 |
| **CASE TITLE** | | Weissman vs. Pre-Press Graphics | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.   Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
        ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]   Enter Memorandum Opinion and Order.  For the reasons stated therein, the December 17, 2002 order of the bankruptcy court is affirmed.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | MAR 24 2004 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| ETV | courtroom deputy's initials | 3/23/2004 |
| | | date mailed notice |
| | | ETV |
| | Date/time received in central Clerk's Office | mailing deputy initials |

U.S. DISTRICT COURT
CLERK
2004 MAR 23 PM 4: 35

Document Number

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 2 4 2004

In re:                                    )
                                          )
PRE-PRESS GRAPHICS COMPANY,               )
INC.,                                     )
                                          )
                Debtor.                   )
                                          )
_____  )
BRIAN WEISSMANN,                          )
                                          )        Nos. 03 C 0021/03 C 264
                Appellant,                )
                                          )        Judge Rebecca R. Pallmeyer
        v.                                )
                                          )
PRE-PRESS GRAPHICS COMPANY,               )
INC., MAN CAPITAL CORPORATION,            )
                                          )
                Appellees.                )

## MEMORANDUM OPINION AND ORDER

Appellant Brian Weissmann appeals a December 17, 2002 order of the bankruptcy court requiring that Weissmann's claim against Debtor Pre-Press Graphics Company ("Pre-Press" or "Debtor") be subordinated to the claims of unsecured creditors pursuant to 11 U.S.C. § 510(b). Weissmann's claim is based on an Illinois state court judgment. In that state action, Weissmann, a shareholder and former director of Pre-Press, alleged that his fellow directors engaged in stockholder oppression and breach of fiduciary duty when they removed him from his position on the board and secretly issued additional stock which significantly diluted his ownership interest in Debtor. Weissmann prevailed in that action and the state court ordered that Debtor purchase Weissmann's shares for $1,383,350. Without appealing the state court's ruling or complying with the judgment, on March 4, 2002, Pre-Press declared voluntary Chapter 11 bankruptcy. Weissmann filed his claim (based on the state court judgment) before the bankruptcy court, over objections from both Debtor and MAN Capital Corporation (collectively "Appellees"), Debtor's largest creditor. Appellees argued that Weissmann's claim is subject to mandatory subordination

3

under § 510(b) because it arises from the purchase or sale of Debtor's securities. The bankruptcy court agreed and Weissmann appealed to this court. For the reasons set forth here, the decision of the bankruptcy court is affirmed.

## BACKGROUND

Both sides agree on the factual issues relevant to this appeal and raise strictly legal arguments regarding the proper scope of 11 U.S.C. § 510(b). The court will nonetheless provide a brief factual background to place the legal dispute in context.

In 1989, Weissmann and Robert Beevers founded Pre-Press and served as the company's initial shareholders and directors, each holding a 50 percent interest in the company. (*Weissmann v. Pre-Press Graphics Co.*, 00 CH 13071 (Feb. 1, 2002) (hereinafter "Illinois Judgment"), Exhibit H to Brief of Appellant Brian Weissmann (hereinafter "Appellant Br."), at 1.) Pre-Press provides printing and pre-press services to advertising agencies and commercial clients, such as converting an image into a digital format before reproducing it on a printing press. (*Id.*) Initially, Weissmann provided Pre-Press with most of its business contacts and sales expertise, while Beevers contributed his financial background and resources. (*Id.*) In 1992, both Beevers and Weissmann reduced their ownership interest in Pre-Press to 45 percent each, transferring the remaining 10 percent of the company's stock to two new shareholders, Shirlee Kay-Myers and Albert Myers.[1] (*Id.* at 2.) After the transfer, Weissmann remained one of the two primary shareholders in Pre-Press. (*Id.*)

On January 1, 1998, Pre-Press adopted a Shareholder's Agreement which placed restrictions on the transfer of shares and included a non-competition provision for shareholders.

---

[1]     The record does not indicate the respective percentage ownership interests of Shirlee Kay-Myers and Albert Myers.

(*Id.*) At that point, Weissmann and Beevers each held 37.9 percent of the shares. The remaining shares were divided among six additional shareholders.[2] (*Id.*)

During 1997 and 1998, Pre-Press entered negotiations with Schawk Incorporated, a publicly traded pre-press company, regarding a possible sale of Pre-Press to Schawk. (*Id.*) In October 1998, Schawk provided a letter of intent to purchase all of Pre-Press' stock for $13 million on a "debt-free basis" or, in the alternative, to purchase the stock of any tendering shareholder at a pro-rated price. (*Id.* at 3.) Weissmann was in favor of accepting the offer, but the remaining shareholders rejected the proposal. (*Id.*) Weissmann then offered to sell his stock to Pre-Press for $5.5 million but the shareholders rejected his offer as well. (*Id.*) Weissmann still wanted to sell his stock to Schawk in accordance with the October 1998 letter of intent, but the Pre-Press stockholders prevented the sale by exercising their right of first refusal.[3] (*Id.*)

On December 1, 1998, Pre-Press and Weissmann executed a stock repurchase agreement ("Repurchase Agreement"). (*Id.*) Pursuant to that agreement, Pre-Press was to purchase Weissmann's 37.9 percent interest in the company (500 shares) for the sum of $4,725,000 ($9,450 per share), subject to a financing contingency. (*Id.*) The financing contingency required Pre-Press "to make every effort possible or necessary to obtain financing." (*Id.* at 6.) The Repurchase Agreement also required Pre-Press to make a down payment to Weissmann of $100,000 that was not contingent on Pre-Press' obtaining financing. (*Id.* at 5.) As for Weissmann's involvement with the company, the agreement provided that he would continue to serve as a director for two years. He was released, however, from the non-competition provisions of the Shareholders' Agreement, and was therefore free to work for, and become a shareholder of, Schawk. Accordingly,

---

[2]    The record does not explain how Weissmann's ownership interest was reduced from 45 percent to 37.9 percent, nor identify the new shareholders.

[3]    The record is unclear as to why the Pre-Press shareholders' rejection of Weissmann's first offer to sell at $5.5 million did not satisfy the right of first refusal.

Weissmann left Pre-Press the day he executed the Repurchase Agreement and became an employee of Schawk. Pre-Press, in turn, named three additional company directors. (*Id.* at 3, 11.)

On December 31, 1998, Pre-Press paid the first $25,000 of the $100,000 down payment. The company failed, however, to pay the remaining $75,000 due on January 31, 1999. (*Id.* at 5.) Pre-Press did make substantial efforts to obtain financing for the Repurchase Agreement, but was unable to do so. (*Id.* at 3-4.) In or about July 1999, Schawk sent another letter of intent to Pre-Press, this time offering to purchase the company's assets related to the pre-press business for $6,500,000 on a debt-free basis. (*Id.* at 4.) If Pre-Press had accepted the terms of the offer, it would have retained its commercial printing business, which made up 40 percent of its total revenue. (*Id.*) As with the earlier offer, the shareholders rejected the July 1999 letter of intent. (*Id.*)

In February 2000, Pre-Press was in need of capital and, as a result, authorized the issuance of additional shares of stock to certain shareholders. Beevers purchased an additional 6,500 shares at $106.14 per share, increasing his percentage ownership of Pre-Press from 37.9 percent to 87 percent. (*Id.*) Pre-Press did not give Weissmann the opportunity to purchase more shares and, in fact, deliberately hid from Weissmann the fact that it was issuing additional stock. (*Id.*) As a result, Weissmann's ownership interest was reduced from 37.9 percent to 6.29 percent. (*Id.*) Shortly thereafter, Weissmann made a demand to inspect certain corporate records. His request was denied. (*Id.*)

Notwithstanding the Repurchase Agreement, which released Weissmann from his covenant not to compete and assured that he would be re-elected as a director of Pre-Press through 2000, Weissmann was asked to resign as a director in July 2000 because of his conflicting employment with Schawk. (*Id.*) The company called a shareholder's meeting for the express purpose of removing Weissmann as a director, but he resigned his position in August 2000 before the shareholders effected the removal themselves. (*Id.*)

4

On September 6, 2000, Weissmann filed a lawsuit in the Circuit Court of Cook County alleging minority shareholder oppression, breach of fiduciary duty by certain directors and shareholders, and breach of the Repurchase Agreement. (*Id.* at 5.) The court determined that Pre-Press committed both shareholder oppression and breach of fiduciary duty – claims the court found "inextricably intertwined" – by the following acts: (1) demanding in July 1999 that Weissmann resign as a director; (2) conducting secret capital transactions in 2000 which resulted in the reduction of Weissmann's ownership interest; and (3) deciding to accept a share valuation of $106.14 per share despite receiving offers ranging from $2,000 to more than $9,000 as a per share price. (*Id.* at 7, 12, 15-16.) The Circuit Court found that Pre-Press did not breach the "best efforts" clause of the Repurchase Agreement by failing to obtain financing, but it did breach that agreement by failing to pay Weissmann the $75,000 "additional down payment" it owed him. (*Id.* at 7.)

As a remedy for the shareholder oppression and breach of fiduciary duty, the court ordered Pre-Press to repurchase Weissmann's 500 shares at "fair value," which the court determined was $1,383,350. The court subtracted from that amount the $25,000 partial down payment Weissmann had already received from the company and, if paid, the additional $75,000 down payment awarded for Pre-Press' breach of the Repurchase Agreement. (*Id.* at 19-24.) The court also awarded Weissmann $10,000 for Pre-Press' refusal to allow Weissmann to examine the corporate records in violation of the Illinois Business Corporation Act, 805 ILCS 5/7.75. (*Id.* at 24.)

The Circuit Court entered this judgment on February 1, 2002. (*Id.*) Although Pre-Press had the opportunity to appeal the decision within thirty days, it opted not to do so. Instead, on March 4, 2002, Pre-Press filed a voluntary Chapter 11 bankruptcy case in the Northern District of Illinois. (Voluntary Petition, Ex. B to Appellant Br.) Any opportunity for Pre-Press to appeal the state court judgment has now passed and the judgment is final.

On May 16, 2002, Weissmann filed a proof of claim against the Debtor's estate in the amount of $1,365,000.[4] (Proof of Claim, Ex. I to Appellant Br.) On September 30, 2002, Pre-Press filed its proposed plan of reorganization, placing Weissmann's claim in a class that is subordinate to the claims of unsecured creditors. (Plan of Reorganization, Ex. J to Appellant Br.) Consistent with that proposed plan, on October 15, 2002, the Debtor and its largest creditor, MAN Capital Corporation ("MAN Capital"), filed objections to Weissmann's claim on the grounds that it arises from the sale of securities and, thus, must be subordinated under § 510(b) of the Bankruptcy Code.

The bankruptcy court considered the objections and, in an oral ruling on December 17, 2002, found in favor of Debtor and MAN Capital. The court determined that Weissmann's "theory and causes of action were merged in the state court judgment." (Transcript of Bankruptcy Court Proceedings in the Pre-Press Bankruptcy Case, ("Bankruptcy Decision"), Exhibit E to Appellant Br., at 51.) Weissmann's "claim" under the Bankruptcy Code, the court held, consists of what he received from the Illinois judgment – i.e., the forced repurchase of his shares. In the bankruptcy court's view, such a claim is "inextricably intertwined with [Weissmann's] shareholder status" and, thus, fits within § 510(b) and must be subordinated to the claims of unsecured creditors. (Id. at 51-52.)

## DISCUSSION

### I.    Standard of Review and Jurisdiction

This court has subject matter jurisdiction over Weissmann's appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1), which vests the district court with jurisdiction over appeals from "final judgments, orders and decrees" issued by the bankruptcy court. The district court functions as an appellate court when reviewing bankruptcy court decisions. Bielecki v. Nettleton,

---

[4]    It is not clear how Weissmann arrived at the $1,365,000 figure. Notably, throughout his appellate brief, Weissmann refers to his claim as amounting to $1.3 million.

183 B.R. 143, 145 (N.D. Ill. 1995) (citing FED. R. BANKR. P. 8013). In a bankruptcy appeal, the court examines the "bankruptcy court's factual findings for clear error and its legal conclusions *de novo*." *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). The parties in this case raise exclusively questions of law, which the court will review *de novo*.

This case presents an issue of first impression in the Seventh Circuit; namely, the proper scope of § 510(b) of the Bankruptcy Code. Section 510(b) states:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). Section 510(b) functions to subordinate three types of claims: "(1) an actual attempt to rescind a purchase or sale of a security issued by the debtor or one of its affiliates; (2) a claim for damages arising from a purchase or sale of a security; and (3) a claim for reimbursement or contribution for a purchase or sale of such a security under section 502 of the Code." *In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir. 2002).

The parties do not dispute that Weissmann owned securities (500 shares) of Debtor for purposes of § 510(b). The parties agree, further, that Weissmann's claims are not an attempt to rescind the purchase of his securities, nor to obtain reimbursement or contribution related to his purchase of stock. Instead, the core of the parties' dispute is whether Weissmann's claim for stockholder oppression "arises from" the purchase or sale of Debtor's securities.[5] *See In re Geneva Steel*, 281 F.3d at 1177-78. If it does, the claim will be treated as an equity interest that does not get paid in the bankruptcy distribution until the claims of all unsecured creditors have been paid in full. 11 U.S.C. § 510(b); *Wilkow v. Forbes, Inc.*, 241 F.3d 552, 554 (7th Cir. 2001) (under

---

[5] Weissmann acknowledges that his claim related to Debtor's breach of the Repurchase Agreement arises from the purchase or sale of securities.

7

"absolute priority rule," "unsecured creditors must be paid off before equity holders retain an interest"). If it does not, the claim will be treated as one belonging to an unsecured creditor. *See, e.g., In re Joliet-Will County Community Action Agency*, 847 F.2d 430, 434 (7th Cir. 1988) (tort claimants are treated as unsecured creditors in bankruptcy). Thus, the classification of Weissmann's claim will have a significant impact on his potential distribution in Debtor's bankruptcy proceedings.

## II. Weissmann's Bankruptcy Claim

Before addressing whether Weissmann's claim arises from the purchase or sale of securities, the court considers the proper characterization of that claim. Appellees argue that Weissmann's claim is the right to payment of the judgment he submitted to the bankruptcy court; i.e., the state court order requiring Pre-Press to purchase Weissmann's 500 shares for approximately $1.3 million. Appellees insist that it is this "claim" which must be evaluated under § 510(b). Weissmann, on the other hand, argues that the court must define his claim by looking at the substantive claims he raised in state court (stockholder oppression and breach of fiduciary duty). In the court's view, Weissmann's is the better-reasoned approach.

Under § 101(A)(5) of the Bankruptcy Code, "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(A)(5). In arguing that Weissmann's "claim" is for the forced repurchase of his Pre-Press shares, Appellees assert that this court is bound by the relief granted by the state court and cannot examine the underlying substantive claims. This interpretation, however, conflicts with the broad definition above, which indicates that a claim exists prior to judgment. *See F.C.C. v. NextWave Personal Communications Inc.*, 537 U.S. 293, 302 (2003) (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)) ("[w]e have said that 'claim' has 'the broadest available

8

definition'"). It also could result in similar claimants receiving different treatment based on the relief granted by the state court.

In considering other portions of the Bankruptcy Code, the United States Supreme Court has determined that it is permissible for a court to examine the underlying claims creating the claimant's right to payment. In *Brown v. Felsen*, 442 U.S. 127 (1979), for example, Brown sued Felsen in state court to recover money that Felsen had allegedly obtained by fraud. *Id.* at 128. The parties settled the case by a stipulation that stated Felsen would pay Brown a certain amount of money, but did not indicate whether the payment was related to Felsen's alleged fraud. *Id.* Felsen failed to make payments in accordance with the stipulation and ultimately filed for bankruptcy, seeking a discharge of his debt to Brown. *Id.* Brown asked the bankruptcy court to find the debt nondischargeable as a debt for money obtained by fraud. *Id.* at 129; 11 U.S.C. § 523(a)(2)(A) (a debt is not dischargeable in bankruptcy "to the extent" it is "for money obtained by . . . false pretenses, a false representation, or actual fraud"). The bankruptcy court refused, finding instead that the debt was related to money owed pursuant to a stipulation, and the district court and the Tenth Circuit affirmed. *Id.* at 130-31. The Supreme Court reversed, however, holding that the lower courts should have looked beyond the stipulation to determine whether the debt arose from fraud. *Id.* at 138-39.

More recently, in *Archer v. Warner*, 538 U.S. 314 (2003), Arlene and Leonard Warner sold a manufacturing company to Elliott and Carol Archer for $610,000. Six months later, the Archers sued the Warners for fraud and other claims in connection with the sale. *Id.* As part of a subsequent settlement agreement, the Archers released substantially all their claims against the Warners in exchange for $300,000. The Warners paid $200,000 immediately and executed a promissory note for the remaining $100,000. *Id.* When the Warners failed to make the first payment on the promissory note, the Archers sued for payment in state court. *Id.* at 317-18. Before the matter was heard, the Warners filed for bankruptcy and the bankruptcy court ordered

liquidation under Chapter 7 of the Bankruptcy Code. *Id.* at 318. The Archers timely filed a claim before the bankruptcy court asking the court to find that the $100,000 debt the Warners owed them was nondischargeable as "money . . . obtained by . . . fraud." *Id.*; 11 U.S.C. § 523(a)(2)(A). The lower courts found that the $100,000 debt was dischargeable because the settlement agreement had worked a "novation." *Id.* Specifically, the new debt arising from the settlement agreement had replaced the prior potential debt the Warners owed the Archers, and only that prior debt had been based on fraud. *Id.* The Supreme Court reversed, holding that even if the settlement had "worked a kind of novation," that did not bar the Archers from showing that the settlement debt "arose out of 'false pretenses, a false representation, or actual fraud'" such that it was nondischargeable under § 523(a)(2)(A). *Id.* at 322-23.

In both of these cases, the Supreme Court found that in determining whether a debt is for money obtained by fraud, courts may look beyond the terms of a settlement agreement or consent decree and examine the underlying substantive claims. Here, the court is confronted with a similar question: whether Weissmann's substantive claims of oppression and breach of fiduciary duty were replaced by the state court judgment ordering the forced repurchase of Weissmann's stock. Given the broad definition of "claim" and the Supreme Court's willingness to look to the substance of claims in assessing whether they are nondischargeable in bankruptcy due to fraud, the court finds that for purposes of § 510(b), Weissmann's "claim" should be determined according to the substance of his state court claims and not limited to the type of relief granted by the state court.

III.    The Scope of § 510(b)

The next question is whether Weissmann's shareholder oppression and breach of fiduciary duty claims are claims "for damages arising from the purchase or sale" of securities of the Debtor. 11 U.S.C. § 510(b). Weissmann argues that the court should construe § 510(b) narrowly and find that it applies only to claims that arise from a stock transaction, and not to any post-investment

conduct by the Debtor. Under such a construction, § 510(b) does not subordinate Weissmann's tort claims for shareholder oppression and breach of fiduciary duty because they arose ten years after his purchase of stock in Pre-Press. Appellees press for a broader reading of the statute. They recognize that the phrase "arises from" requires "*some* causal relationship between a purchase or sale and the claim," but they argue that § 510(b) does not contemplate "an immediate, contemporaneous connection" with the purchase or sale of stock. (Brief of Appellee MAN Capital Corporation (hereinafter "MAN Br."), at 8) (emphasis in original).

### A.    Statutory Language

In assessing these arguments, the court starts with the text of the statute itself. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Where a statute is unambiguous, the court "must enforce the plain meaning of the language enacted by Congress." *Matter of Voelker*, 42 F.3d 1050, 1051 (7th Cir. 1994) (quoting *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1060 (7th Cir. 1994)). The court "will look beyond the express language of a statute only where that statutory language is ambiguous or where a literal interpretation would lead to an absurd result or thwart the purpose of the overall statutory scheme." *United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave.*, 903 F.2d 490, 492 (7th Cir. 1990).

In this court's view, the plain wording of the statute is not instructive regarding the scope of § 510(b) because the phrase "arising from the purchase or sale" is reasonably susceptible to more than one interpretation. As the Tenth Circuit recently explained, "[a] literal reading implies that the injury must flow from the actual purchase or sale [of securities]; a broader reading suggests that the purchase or sale must be part of the causal link although the injury may flow from a subsequent event." *In re Geneva Steel*, 281 F.3d at 1178-79 (quoting *In re Granite Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997)). *See also In re Telegroup, Inc.*, 281 F.3d 133, 138 (3d Cir. 2002) (recognizing two possible interpretations of the phrase "arising from"). Indeed,

courts have adopted both approaches in deciding the proper scope of the "arising from" language. *Compare, e.g., In re Montgomery Ward Holding Corp.,* 272 B.R. 836, 842 (Bankr. D. Del. 2001) ("[t]he plain language of § 510(b) . . . applies only to a claim that directly concerns the stock transaction itself, i.e., the actual purchase and sale of the debtor's security must *give rise* to the contested claim") (emphasis in original), and *In re Amarex, Inc.,* 78 B.R. 605, 610 (W.D. Okla. 1987) ("the Court finds that only claims which are based upon alleged violations of securities laws and which arise from the purchase and sale of such securities fall within the scope of Section 510(b)"), *with In re Geneva Steel,* 281 F.3d at 1182 ("the statute is not limited to issuance-related claims"), and *In re Granite Partners,* 208 B.R. at 333-34 (claim that debtor fraudulently induced claimant to retain securities arose from purchase or sale of securities for purposes of § 510(b)).

In light of these conflicting interpretations, there can be little doubt that § 510(b) is ambiguous. Thus, the court must look to the legislative history of the provision and to the policies underlying it to determine whether Weissmann's claim "arises from" the purchase of Pre-Press' stock.

## B.    Legislative History

In enacting § 510(b), Congress relied heavily on a law review article drafted in 1973 by John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy - - Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors,* 48 N.Y.U. L. Rev. 261 (1973) ("Slain and Kripke"). This court's review of the legislative history of § 510(b) will begin with that article. *See* Report of the Committee on Judiciary, Bankruptcy Law Revision, H.R. Rep. No. 95-595, at 196 (1977) (discussing the Slain/Kripke article and stating that "the bill generally adopts the Slain/Kripke Position"). *See also In re Telegroup,* 281 F.3d at 139 ("in enacting § 510(b), Congress relied heavily on a law review article written by John J. Slain and Homer Kripke"); *In re Granite Partners,* 208 B.R. at 336 ("[a]ny discussion of section

510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke").

As the Third Circuit noted, Slain and Kripke understood the issue as "one of risk allocation" and opined that "claims of shareholders alleging fraud or other illegality in the issuance of stock should generally be subordinated to the claims of general unsecured creditors." *In re Telegroup*, 281 F.3d at 139. In drawing this conclusion, the professors distinguished between two types of risk accepted by investors and creditors: "(1) the risk of the debtor's insolvency and (2) the risk of illegality in the issuance of the debtor's securities." *In re Granite Partners*, 208 B.R. at 336 (citing Slain and Kripke, at 286). Slain and Kripke explained in their article that investors and creditors both accept the risk of insolvency, though that risk is different between the two. *Id.* In contrast, investors alone bear the risk of illegality in the issuance of securities.

Creditors expect nothing more from the business than the repayment of a fixed debt, regardless of whether the business prospers. Creditors also rely on the investment made by stockholders to serve as an equity cushion for the repayment of their claims. *Id.* Investors, on the other hand, share in the profits of the business, a benefit not afforded to creditors. According to Slain and Kripke, shareholders bear an enhanced risk of insolvency because of this unique right: "the allocation of the risk, as between the investor and the creditor, is reflected in the absolute priority rule, and should not be reallocated." *Id.* (citing Slain and Kripke, at 286-87.) The "absolute priority rule," codified in 11 U.S.C. § 1129(b)(2)(B)(ii), assures that "stockholders seeking to recover their investments cannot be paid before provable creditor claims have been satisfied in full." Slain and Kripke, at 261. *See also Wilkow*, 241 F.3d at 554 (under "absolute priority rule," "unsecured creditors must be paid off before equity holders retain an interest").

At the heart of the Slain and Kripke proposal was a policy decision "to prevent disappointed shareholders from recovering the value of their investment by filing bankruptcy claims predicated on the issuer's unlawful conduct at the time of issuance, when the shareholders assumed the risk

13

of business failure by investing in equity rather than debt instruments." *In re Telegroup*, 281 F.3d at 140-41 (citing Slain and Kripke, at 261, 267-68). "Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event that issuer enters bankruptcy." *Id.*

In reaching their conclusion, Slain and Kripke focused on fraudulent issuance claims. The authors did not, however, limit their analysis to the subordination of claims arising at the time of issuance. Instead, their article reflects an intent to address a broader concern; namely, the subordination of claims by investors seeking to reclaim their lost investment. Specifically, Slain and Kripke stated:

> We are only incidentally concerned with the precise predicate of a disaffected stockholder's efforts to recapture his investment from the corporation. For present purposes it suffices to say that when the basis of the stockholder's disaffection is either the issuer's failure to comply with registration requirements or the issuer's material misrepresentations, one or more state or federal claims may be made. Our purpose is to consider the impact of such claims on the distribution of the corporation's assets in bankruptcy and the development of a plan of reorganization under Chapter X.

*In re Granite Partners*, 208 B.R. at 337 (quoting Slain and Kripke, at 267). In the court's view, this language suggests that the Slain and Kripke rationale underlying § 510(b) applies to claims beyond those arising at the time stock is issued. To the extent Slain and Kripke were primarily concerned with disappointed shareholders attempting to better their positions in bankruptcy by filing lawsuits to reclaim a portion of their equity investment, their article properly extends to claims beyond those arising at the time of issuance.

At the same time, "Congress did not intend to subordinate every claim brought by a shareholder, regardless of the nature of the claim." *In re Telegroup*, 281 F.3d at 144 n.2. Indeed, the parties agree that a claim is not automatically subordinated merely because the claimant is a shareholder of the debtor:

> Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies underlying § 510(b), which was intended to prevent shareholders from recovering their equity investment in parity with general unsecured creditors.

*Id.* (*See also* MAN Br., at 13; Appellant Br., at 14.) As the *Telegroup* court thus observed, the legislative history of § 510(b) reflects an intent to require some causal link between a claim and the purchase or sale of securities.

### C.    Case Law

Courts that have considered this issue have reached conflicting conclusions as to whether § 510(b) should be broadly or narrowly construed. Weissmann directs the court to three decisions supporting the narrow approach: *In re Amarex*, 78 B.R. 605 (W.D. Okla. 1987), *In re Angeles Corp.*, 177 B.R. 920 (Bankr. C.D. Cal. 1995), and *In re Montgomery Ward Holding Corp.*, 272 B.R. 836 (Bankr. D. Del. 2001). The statutory interpretation set forth in these cases, however, has been called into doubt by recent decisions from the Third, Ninth, and Tenth Circuits.

In *In re Amarex*, certain limited partners of a debtor corporation filed a claim in the bankruptcy proceeding, charging that the general partner violated federal securities laws in connection with the issuance of the limited partnership units, mismanaged the partnership, and committed breach of contract, breach of fiduciary duty, negligence, and common law fraud. 78 B.R. at 606. The bankruptcy court subordinated all of the limited partners' claims under § 510(b) because claimants "would have no claims against the debtor but for their purchase of the securities, and had the purchase not occurred they would not have the pendent common law claims." *Id.* at 608. In rejecting the bankruptcy court's interpretation, the district court found that § 510(b) "pertains only to claims based upon the alleged wrongful issuance and sale of the security and does not encompass claims based upon conduct by the issuer of the security which occurred

after this event." *Id.* at 610. The court thus declined to subordinate those common law claims which arose from debtor conduct subsequent to the issuance of the securities. *Id.*

Contrary to Weissmann's assertion, the reasoning in *Amarex* is not instructive in this case because the decision has been abrogated by *In re Geneva Steel Co.*, 260 B.R. 517 (B.A.P. 10th Cir. 2001), *aff'd*, 281 F.3d 1173 (10th Cir. 2002).[6] In *In re Geneva Steel*, a bondholder of the debtor filed a claim in the bankruptcy proceedings alleging that the debtor's fraud caused him to retain his debt securities. *Id.* at 519. The Bankruptcy Appellate Panel of the Tenth Circuit subordinated the claim under § 510(b) even though the allegations of fraud arose after the stock was issued. *Id.* at 523. The court explained that at the time the claimant accepted the notes "he accepted the same risks as [debtor's] other investors." *Id.* In the court's view, "[t]he fact that the value of the Notes declined while [claimant] held them, even if his allegations of fraud are true, should not enable him to 'eviscerate the absolute priority rule, and shift to creditors the investment risk assumed by the [note holders].'" *Id.* (quoting *In re Granite Partners*, 208 B.R. at 342). The court found that § 510(b) requires "a causal connection between the purchase or sale of the securities and the damages alleged," and that the link exists when "the holder of securities alleges post-investment fraud." *Id. See also In re NAL Financial Group, Inc.*, 237 B.R. 225, 232 (Bankr. S.D. Fla. 1999) (adopting broader interpretation of § 510(b) and finding "no distinction between fraud committed during the purchase of securities and fraud (or a wrongful act) committed subsequent thereto that adversely affects one's ability to sell those securities").

---

[6]     MAN Capital has filed a motion under Bankruptcy Rule 8011 for leave to cite supplemental authority in connection with this bankruptcy appeal to clarify the holding of the Tenth Circuit in *In re Geneva Steel*. MAN Capital objects to Weissmann's assertion that it "misrepresented" that *In re Geneva Steel* has "overruled" *Amarex* in the Tenth Circuit. (Motion for Leave to Cite Supplemental Authority, at 2.) Essentially, the parties dispute the meaning of the terms "overruled" and "abrogated." The court agrees with MAN Capital that the Tenth Circuit intended to, and did in fact, abrogate *Amarex*. *See In re Geneva Steel*, 281 F.3d at 1182 n. 5 ("[h]aving rejected the holding of *Amarex*, we similarly decline to follow *In re Angeles*"). Accordingly, the court grants MAN Capital's motion.

16

The Tenth Circuit agreed that the claimant's post-investment claims were properly subordinated in light of the "strong congressional disapproval of investor fraud claims in bankruptcy." 281 F.3d at 1179. The court reasoned:

> [The claimant's] claim, at its essence, accuses Geneva of manipulating information concerning his investment. He acquired and held that investment with the belief that its value would increase, though he no doubt recognized that for any number of reasons it might not; indeed, he recognized that it might even lose value. In contrast, a mere creditor of [the debtor] could expect nothing more than to recoup the value of goods or services supplied to the company. Yet now, having watched his investment gamble turn sour, [the claimant] would shift his losses to those same creditors. We think this effort clashes with the legislative policies that section 510(b) purports to advance.

*Id.* at 1180. In reaching this conclusion, the Tenth Circuit declined to follow the reasoning in *Amarex*, finding that the court's "constricted interpretation of section 510(b) flows from a mistaken reading of the statutory text, a reading that erroneously substituted the more restrictive term 'issuance' for the actual term 'purchase.'" *Id.* at 1182.

For similar reasons, the court does not find *In re Angeles Corp.*, 177 B.R. 920 (Bankr. C.D. Cal. 1995) persuasive. In *In re Angeles*, a number of limited partners filed a claim against the debtor alleging acts of mismanagement, fraud, breach of fiduciary duty, and other wrongful conduct in relation to the debtor's management of the partnerships. *Id.* at 922. Relying on *In re Amarex*, the court held that the limited partners' claims alleging mismanagement, breach of fiduciary duty, and fraud were not subject to mandatory subordination under § 510(b) because they resulted from conduct that took place after the purchase of the securities. *Id.* at 926-27.

As noted, *In re Amarex* is no longer good law in the Tenth Circuit. More importantly, a recent Ninth Circuit decision appears to support a broader interpretation of § 510(b) than the one espoused in *In re Angeles*. The claimant in *In re Betacom of Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001) filed proofs of claim against the debtors for, among other things, breach of a merger agreement and fraud. *Id.* at 826. The claimants asserted that their claim should not be subject to mandatory subordination under § 510(b) because: (1) "§ 510(b) only applies to securities fraud

17

claims"; (2) the claimants "never enjoyed the 'rights and privileges' of stock ownership"; and (3) "the Merger Agreement never closed, and, therefore, there was not an actual sale or purchase of securities that could trigger mandatory subordination." *Id.* at 828. The Ninth Circuit rejected all of these arguments and found that the claim was properly subordinated under § 510(b):

> The district court's interpretation of § 510(b) to require an actual stock purchase might be valid in some situations, but not in a situation like the one faced by the [debtors'] creditors who relied on the [claimants'] contribution when they decided to extend credit.

*Id.* at 831. The court was not moved by the fact that the claimants never took possession of the stock, noting that the claimants were "experienced businesspeople who traded their equity in Betacom for a chance at greater earnings with ABS after its initial public offering," and they understood that they "faced the risk that ABS's IPO could fail and that ABS might go bankrupt." *Id.* at 830. In reaching this decision, the court did not expressly address *In re Angeles*, but it is clear that the Ninth Circuit interprets § 510(b) in a broader manner than the lower court.

That leaves *In re Montgomery Ward Holding Corp.*, 272 B.R. 836 (Bankr. D. Del. 2001), Weissmann's final case, in which the court considered whether "a claim based solely on the nonpayment of a promissory note issued by a debtor to consummate the repurchase of its own stock is one for damages 'arising from' the purchase or sale of its securities." *Id.* at 841. The court found that this type of claim is not properly subordinated under § 510(b) because it does not directly concern the stock transaction itself. *Id.* at 842. The claimant was not "an equity holder trying to better his position by undoing the purchase transaction with a rescission or damage claim." *Id.* at 843. Nor was there any allegation that the shares of stock were issued illegally. Rather, the claimant sought to enforce a debt based on the debtor's repurchase of its stock. *Id.* The court held that "absent an allegation of fraud in the purchase, sale or issuance of the debt instrument, § 510(b) does not apply to a claim seeking simple recovery of an unpaid debt due upon a promissory note." *Id.* at 844.

More recently in *In re Telegroup*, however, the Third Circuit declined to adopt such a restrictive interpretation of § 510(b). In *Telegroup*, the court considered a claim seeking damages related to Telegroup's breach of an agreement to use its best efforts to ensure that the claimants' stock was registered and freely tradeable. 281 F.3d at 135. The court found nothing in the rationale behind § 510(b) that prevented its application to post-investment conduct. *Id.* According to the court, the timing of the conduct is not as important as "the fact that the claims in this case seek to recover a portion of claimants' equity investment." *Id.* at 142. The court explained that "[b]ecause claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that § 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors." *Id.* The court also observed that "[w]ere we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails." *Id.* *Compare In re Mobile Tool Int'l, Inc.*, ___ B.R. ___, 2004 WL 415910, at *3 (Bankr. D. Del. Mar. 4, 2004) (finding *In re Montgomery Ward Holding* consistent with *In re Telegroup* to the extent that "the nexus or causal connection required to employ section 510(b) exists where stock is retained by the claimant" and not "[w]hen the stock is exchanged and a separate debt instrument is issued by the debtor").

Based on the legislative history and case law relating to § 510(b), the court concludes that some causal link must exist between the purchase or sale and the claim at issue, but that the causal link need not arise contemporaneously with the purchase or sale of a security. *In re Telegroup*, 281 F.3d at 144 n.2.

## IV.    Application to Weissmann's Claim

No court has yet addressed whether a claim like Weissmann's for shareholder oppression and breach of fiduciary duty falls within the scope of § 510(b). Thus, not only is the proper scope of § 510(b) one of first impression in this circuit, but the court is also writing on a completely blank slate in resolving this matter. Appellees argue that Weissmann's claim for shareholder oppression meets the causal nexus under § 510(b) because: (1) it arises from the failed Repurchase Agreement; and (2) it results from the issuance of additional stock to dilute Weissmann's ownership interest in Pre-Press. (MAN Br., at 8; Appellate Brief of Appellee, Pre-Press Graphics Company, Inc., at 10.)

The court disagrees that Weissmann's claim of stockholder oppression arises from the failed Repurchase Agreement. His only successful cause of action under that agreement was a claim for $75,000 still due as part of Pre-Press' promised down payment on Weissmann's shares. (Illinois Judgment, at 7.) Otherwise, the court found that Pre-Press did not breach the terms of the Repurchase Agreement because it had complied with the "best efforts" clause in attempting to obtain financing for the buy-out. Accordingly, the majority of Weissmann's $1.3 million claim cannot fairly be characterized as arising from the Repurchase Agreement.

The better theory is that Weissmann's claim arises from Pre-Press' oppressive conduct; i.e., (1) the secret issuance of stock to third parties for a greatly reduced price, which diluted Weissmann's ownership interest from 37.9 percent to just over 6 percent, and (2) the removal of Weissmann as a director. As noted, in passing § 510(b), Congress adopted the reasoning set forth by Slain and Kripke, who pointed out that the purpose of subordinating certain claims is to prevent stockholders from reaping the benefits of the company when it performs well but then asserting claims for fraud and enjoying unsecured creditor status when the company performs poorly. In proposing what later became § 510(b), the authors sought to prevent a disaffected shareholder

from recouping his or her investment ahead of unsecured creditors. In the court's view, that is exactly what Weissmann is trying to do here.

When Weissmann and Robert Beevers founded Pre-Press in 1989, they each owned a 50 percent interest in the company. Weissmann later reduced his ownership interest to accommodate additional shareholders, leaving him with a 37.9 percent ownership interest in 1998. Without Weissmann's knowledge or approval, Pre-Press diluted Weissmann's ownership interest down to just over 6 percent by secretly issuing additional stock at an unreasonably low price. The company also removed Weissmann as a director. The court concludes that Weissmann must be viewed as a disaffected shareholder who brought suit because the value of his stock was diluted by the improper issuance of thousands of additional shares at well below market value. Though he also suffered a reduction in ownership which, in turn, significantly diminished his potential share of future profits, he was at all times a shareholder (owning 500 shares) with ownership benefits. Those shares simply became less valuable due to Pre-Press' misconduct. Nothing in the legislative history of § 510(b) or the case law suggests that the rationale for subordinating shareholder claims – i.e., that shareholders bear a greater risk of insolvency because they enjoy the benefit of sharing in the profits – does not apply where shareholders own a relatively small number or percentage of shares. *See In re Telegroup*, 281 F.3d at 142 ("because claimants retained the right to participate in corporate profits if Telegroup succeeded, we believe that § 510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors").

Moreover, in the fraud cases discussed earlier, the shareholders presumably suffered a loss of profits in addition to a reduction in the value of their shares; a company that is not performing well and has devalued stock is not likely to distribute dividends. *See, e.g., In re Granite Partners*, 208 B.R. at 332 (mismanagement, waste, and breach of fiduciary duty indirectly harm both investors and creditors because "the wrongful conduct erodes the entity's assets, making it less

likely that it will be able to pay creditors and distribute profits to investors. . . Yet under the absolute priority rule, the creditors stand ahead of the investors on the receiving line"). Here, Pre-Press' misconduct resulted in Weissmann receiving a smaller percentage of profits from his 500 shares, and those shares became worth less money. At all times, however, Weissmann continued to enjoy the benefit of sharing in the company's success – and bore the risk of the company's failure. Weissmann disputes this, claiming that such right was extinguished "once the company agreed to redeem the shares at a certain price." (Reply Brief of Appellant Brian Weissmann, at 12.) But if the court looks at the remedy ordered by the state court – repurchase of Weissmann's stock at fair value – there can be no doubt that his claim arises from the purchase or sale of securities.

As noted, it was not the intent of Congress to subordinate all claims raised by a stockholder. *In re Telegroup*, 281 F.3d at 144 n.2. For example, a shareholder's personal injury action against the debtor would not be subject to § 510(b) merely because the individual owns stock in the company. Weissmann's oppression claim, however, arises from the purchase or sale of securities and is properly subordinated under the statute. The court recognizes that Debtor's misconduct has resulted in significant harm to Weissmann and that he likely will never recover under the state court judgment. The court nevertheless concludes his claim is subject to mandatory subordination under § 510(b).

## CONCLUSION

For the reasons stated above, the bankruptcy court's order subordinating Weissmann's claim under § 510(b) of the Bankruptcy Code is affirmed.

ENTER:

Dated: March 23, 2004

REBECCA R. PALLMEYER
United States District Judge